**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

| | | |
|---|---|---|
| **Z-Tel Communications, Inc.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **(1) SBC Communications, Inc.,** | § | |
| **(2) Ameritech Corporation,** | § | **C. A. NO. 5:03CV229** |
| **(3) Pacific Telesis Group,** | § | |
| **(4) Illinois Bell Telephone Company,** | § | |
| **(5) Indiana Bell Telephone Company** | § | |
|   **Incorporated,** | § | |
| **(6) Michigan Bell Telephone Company,** | § | **(JURY DEMANDED)** |
| **(7) Nevada Bell Telephone Company,** | § | |
| **(8) The Ohio Bell Telephone Company,** | § | |
| **(9) Pacific Bell Telephone Company,** | § | |
| **(10) Wisconsin Bell, Inc.,** | § | |
| **(11) Southwestern Bell Telephone, L.P., and** | § | |
| **(12) SBC Advanced Solutions, Inc.** | § | |
| | | |
|   **Defendants.** | | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

Plaintiff Z-Tel Communications, Inc. files this First Amended Complaint[1] against SBC

Communications, Inc., its wholly-owned subsidiaries Ameritech Corporation and Pacific Telesis

Group, their wholly-owned subsidiaries Illinois Bell Telephone Company, Indiana Bell

Telephone Company Incorporated, Michigan Bell Telephone Company, Nevada Bell Telephone

Company, The Ohio Bell Telephone Company, Pacific Bell Telephone Company, and Wisconsin

---

[1] Pursuant to the Order of August 6, 2004, Plaintiff has repled its complaint and omitted cause of action numbers 2, 8, 9, 10, and 11 as pled in Plaintiff's Original Complaint and which were dismissed by the Court.  Plaintiff, however, stands on those claims as they were originally pled and does not, by filing this amended pleading, intend to waive its right to appeal from the dismissal of those claims, and, if necessary to preserve its right to appeal, Plaintiff hereby incorporates those dismissed claims into this pleading pursuant to Fed. R. Civ. P. 10(c).

Bell, Inc., Southwestern Bell Telephone, L.P., a limited partnership wholly owned by wholly-owned SBC subsidiaries, and SBC Advanced Solutions, Inc., a wholly owned subsidiary of SBC Communications, Inc. and SBC subsidiaries, and respectfully shows as follows:

## INTRODUCTION

1.      This is an action for injunctive relief and damages arising out of the unlawful and anticompetitive conduct of SBC Communications, Inc. and its defendant subsidiaries (collectively, "SBC") against Z-Tel Communications, Inc. ("Z-Tel").  A multi-billion dollar company, SBC is an heir to America's longest-lasting and most successful monopolist.  Like that of its corporate ancestors, SBC's course of conduct is a textbook example of abuse of monopoly power.  At virtually every turn, SBC has attempted to stifle competitive entry into the markets it controls, either by denying access to essential facilities or by using its control of those facilities to impose such severe costs, delays, and other restraints on new competitors as to make competition impossible.   SBC's business strategy is to preserve its inherited monopoly by preventing competitors from offering consumers better products and services at lower prices. Indeed, SBC boasts about its efforts to drive up competitors' costs in order to "severely impair" its competitors' business.  By implementing this strategy, SBC can continue to sell the same inferior products and services at the same inflated prices, to the detriment of Z-Tel, consumers, and competition.

2.      After enjoying significant growth as a protected monopolist, SBC inherited the ownership and control of all the physical infrastructure that makes the provision of telephone service possible.  The control of these physical assets is the lynchpin of SBC's undisputed monopoly in the "basic local services" market for provision of local telephone service to small- and medium-sized businesses, described in more detail below.  Moreover, SBC has exploited its

monopoly of the basic local services market to obtain an equally dominant share of the burgeoning market for "enhanced services," such as voice mail.

3.     Z-Tel has sought to compete with SBC and provide consumers better products and services at cheaper prices.  Founded in 1998, Z-Tel is based in Tampa, Florida and now provides basic local and enhanced services in 47 states.  Of course, neither Z-Tel nor anyone else can duplicate the vast physical infrastructure that quite literally connects every house and office that has phone service to every other house and office.  Z-Tel is no mere reseller of that infrastructure.  To the contrary, Z-Tel has approximately 1,200 employees that focus on developing new enhanced services, providing customer service, and managing subscription issues.  Its enhanced services are provided based on Z-Tel's own proprietary software, stored on systems at Z-Tel's Tampa offices.

4.     SBC has engaged in a wide variety of schemes and artifices designed to unlawfully protect and exploit its monopoly power and thwart Z-Tel's ability to offer its advanced products and services to customers.  In its most egregious form, SBC has completely denied access to necessary facilities for the provision of advanced enhanced services, and for the provision of basic local service in some areas.  In other instances, SBC has embarked on a conscious strategy of using its control of these essential facilities to drive up Z-Tel's costs, so that Z-Tel cannot profitably provide products and services that customers want, and that SBC does not even offer.  In particular, SBC has committed the following acts, among others:

- Completely denied access to and interconnection with essential facilities that, if access were granted, would allow Z-Tel to provide to customers enhanced services that only Z-Tel offers, depriving customers of these choices;

- Denied access to network facilities to Z-Tel after SBC had voluntarily considered and was willing to provide access to its network facilities to others;

- Barred customers who use its DSL internet service from switching to Z-Tel or any other competitor of SBC;

- Completely denied access to essential facilities necessary to provide basic local service to customers;

- Refused to allow its essential facilities to be used for the provision of local toll calls, despite express state and federal regulatory orders to do so, thereby requiring Z-Tel to purchase unnecessary additional facilities from long-distance carriers at a cost well above what is economically feasible;

- Demanded unfair wholesale prices from Z-Tel and at the same time offered retail prices believed to be substantially below SBC's cost; thereby creating an illegal price squeeze in an effort to prevent Z-Tel from competing in the market for basic local service;

- Intentionally invoked government processes not to reach a desired result, but instead, as the FCC stated, to force Z-Tel and others "to expend time and resources in state proceedings trying to obtain what SBC was already obligated to offer" thereby delaying provision of basic local and enhanced services to customers with a "potential competitive impact" that was "substantial";

- Deliberately failed to provide timely information about customers terminating their service with Z-Tel (information that SBC has under its exclusive control, by virtue of its control of the essential facilities), causing Z-Tel to improperly bill former customers, and resulting in unnecessary expenditures on account management and regulatory proceedings and disadvantaging Z-Tel against SBC in competing to win back those customers;

- Deliberately supplied false bills to Z-Tel for items it has not ordered or received, or at rates expressly rejected by state agencies, in an effort that the U.S. Department of Justice ("DOJ") has recognized is anti-competitive; and

- Embarked on a malicious public campaign of disparagement, misrepresenting the products and services that Z-Tel and other competitive carriers provide to the public.

5.     These acts, individually and in combination, constitute a deliberate scheme to maintain and even expand SBC's monopoly power by exclusionary, anticompetitive, and illegal means.  By engaging in these acts, SBC has committed flagrant violations of the federal antitrust laws prohibiting monopolization and attempts to monopolize.   They further constitute and evidence violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and the Lanham Act.  SBC's conduct also violates state laws prohibiting breach of contract, tortious interference, unfair competition, and business disparagement and defamation.

6.      As a consequence of SBC's unlawful conduct, Z-Tel has wrongfully been prevented from entering or expanding in markets dominated by SBC and has suffered millions of dollars in damages to its business or property.  In addition, competition has been injured and consumers have been harmed by, among other things, being deprived of the valuable and innovative services that Z-Tel can provide.  By filing this case, Z-Tel requests that this Court compel SBC to remedy the damages inflicted on Z-Tel as a result of SBC's unlawful and anti-competitive acts, and further that the Court order SBC to refrain from engaging in such acts in the future.  In sum, Z-Tel asks that the competitive balance envisioned by the antitrust laws be enforced, and that the injuries suffered by Z-Tel be redressed.

## JURISDICTION AND VENUE

7.      This is a civil action arising under federal law.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 15 U.S.C. §§ 15 and 1121, and 18 U.S.C. § 1964.  This Court has supplemental jurisdiction over Z-Tel's state-law claims pursuant to 28 U.S.C. § 1367.

8.      Venue is proper in this District pursuant to 15 U.S.C. § 22, 15 U.S.C. § 15, and 28 U.S.C. § 1391(b) and (c).  SBC resides in, has an agent in, and transacts business in the Eastern District of Texas.  SBC and its subsidiaries operate as a single business entity, such that all defendants are subject to personal jurisdiction in the Eastern District of Texas and thus may be considered to reside in the Eastern District of Texas.  Furthermore, part of the events or omissions giving rise to Z-Tel's claims were implemented throughout the areas in which SBC does business, including the Eastern District of Texas.  Alternatively, defendants SBC and Southwestern Bell Telephone, L.P., reside in the Eastern District of Texas, and there is no district in which the action may otherwise be brought.  Therefore, venue is proper in the Eastern District of Texas.

## PARTIES

9.      Plaintiff Z-Tel is a Delaware corporation with its principal place of business in Tampa, Florida.  Z-Tel does business throughout the United States, including Texas and within the Eastern District of Texas.

10.      Defendant SBC is a Delaware corporation with its principal place of business in San Antonio, Texas.  SBC is known as a Regional Bell Operating Company ("RBOC").  SBC may be served with process by serving its registered agent for service of process, CT Corporation System, 350 N. St. Paul, Dallas, Texas 75201.

11.      Defendant Ameritech Corporation d/b/a SBC Ameritech Corporation and d/b/a SBC Midwest ("Ameritech") is a wholly-owned subsidiary of SBC and was also an RBOC prior to its merger with SBC.  It is a Delaware corporation and may be served with process by serving its registered agent for service of process, CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604-1101.

12.      Defendant Pacific Telesis Group ("Pacific Telesis") is a wholly-owned subsidiary of SBC and was also an RBOC prior to its merger with SBC.  It is a Nevada corporation and may be served with process by serving its registered agent for service of process, Mary Mello, 485 South Monroe Street, San Jose, California 95128.

13.      Defendant Illinois Bell Telephone Company d/b/a Ameritech Illinois, SBC Ameritech Illinois, and SBC Illinois is a wholly-owned subsidiary of Ameritech and employs SBC Telecommunications, Inc., which has its principal place of business in Texas, as an agent in the conduct of its business with Z-Tel.  Defendant is an Illinois corporation and may be served with process by serving its registered agent for service of process, CT Corporation System, 208 South LaSalle Street, Chicago, IL 60604-1136.

14.     Defendant Indiana Bell Telephone Company Incorporated d/b/a Ameritech Indiana, SBC Ameritech Indiana, and SBC Indiana is a wholly-owned subsidiary of Ameritech and employs SBC Telecommunications, Inc., which has its principal place of business in Texas, as an agent in the conduct of its business with Z-Tel.  Defendant is an Indiana corporation and may be served with process by serving its registered agent for service of process, CT Corporation System, 36 South Pennsylvania Street, Suite 700, Indianapolis, IN 46204.

15.     Defendant Michigan Bell Telephone Company d/b/a Ameritech Michigan, SBC Ameritech Michigan, and SBC Michigan is a wholly-owned subsidiary of Ameritech and employs SBC Telecommunications, Inc., which has its principal place of business in Texas, as an agent in the conduct of its business with Z-Tel.  Defendant is a Michigan corporation and may be served with process by serving its registered agent for service of process, Corporation Co., 615 Griswold, Detroit, MI 48226.

16.     Defendant Nevada Bell Telephone Company d/b/a SBC Nevada Bell Telephone Company is a wholly-owned subsidiary of Pacific Telesis and employs SBC Telecommunications, Inc., which has its principal place of business in Texas, as an agent in the conduct of its business with Z-Tel.  Defendant is a Nevada corporation and may be served with process by serving its registered agent for service of process, Corporation Trust Company of Nevada, 6100 Neil Road, Suite 500, Reno, NV 89511.

17.     Defendant The Ohio Bell Telephone Company d/b/a Ameritech Ohio, SBC Ameritech Ohio, and SBC Ohio is a wholly-owned subsidiary of Ameritech and employs SBC Telecommunications, Inc., which has its principal place of business in Texas, as an agent in the conduct of its business with Z-Tel.  Defendant is an Ohio corporation and may be served with

process by serving its registered agent for service of process, CT Corporation System, 17 South High Street, Columbus, OH 43215.

18.     Defendant Pacific Bell Telephone Company d/b/a/ Pacific Bell, Inc. is a wholly-owned subsidiary of Pacific Telesis Group and employs SBC Telecommunications, Inc., which has its principal place of business in Texas, as an agent in the conduct of its business with Z-Tel. Defendant is a California corporation and may be served with process by serving its registered agent for service of process, CT Corporation System, 818 West Seventh Street, Los Angeles, California 90017.

19.     Defendant Wisconsin Bell, Inc. d/b/a Ameritech Wisconsin, SBC Ameritech Wisconsin, and SBC Wisconsin is a wholly-owned subsidiary of Ameritech and employs SBC Telecommunications, Inc., which has its principal place of business in Texas, as an agent in the conduct of its business with Z-Tel.  Defendant is a Wisconsin corporation and may be served with process by serving its registered agent for service of process, CT Corporation System, 8025 Excelsior Drive, Suite 200, Madison, WI 53717.

20.     Defendant Southwestern Bell Telephone, L.P. d/b/a Southwestern Bell Telephone Company, SBC Arkansas, SBC Kansas, SBC Missouri, SBC Oklahoma, SBC Texas, and SBC Southwest is a Texas limited partnership.  Defendant may be served with process by serving its registered agent for service of process, David C. Welch, One Bell Plaza, Dallas, Texas 75202, or by serving its general partner, SWBT Texas LLC, 175 East Houston Street, San Antonio, Texas 78205.

21.     Defendant SBC Advanced Solutions, Inc. is a jointly owned subsidiary of defendant SBC Communications, Inc., defendant Pacific Telesis Group, and Southern New England Telecommunications Corporation.   SBC Advanced Solutions, Inc. is a Delaware

corporation and may be served with process by serving its registered agent for service of process, CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604-1101. This party is only a defendant as to Z-Tel's Fourth Cause of Action.

22.    SBC and its subsidiaries, which are collectively and appropriately referred to as "SBC" throughout this complaint, effectively operate as a single enterprise.  From its corporate headquarters in San Antonio, Texas, SBC controls its subsidiaries to such a degree that they act as its instrumentalities.  SBC also operates nationwide under a single SBC brand.  SBC has perpetrated the wrongs of which Z-Tel complains through its subsidiaries, which serve as instrumentalities acting on SBC's behalf and on their collective behalf, or as SBC's agent or alter ego.  In particular, SBC coordinates an overall position concerning access to physical facilities and provisioning of services from its home office in San Antonio, Texas.  SBC also operates a single wholesale operation on behalf of all the SBC subsidiaries.  However, as described below, SBC's subsidiaries have undertaken roles distinct and separate from SBC in certain conduct at issue.

<u>**BACKGROUND**</u>

**I.    <u>The Nature of Z-Tel 's Competition With SBC</u>**

23.    Z-Tel is a telecommunications company that competes against SBC to provide telephone service to residential and small and medium-sized business customers.  SBC has a stranglehold on certain physical assets necessary to provide such services, and Z-Tel can only provide these services if it has access to these facilities.  Thus, Z-Tel leases these essential facilities from SBC and combines them with Z-Tel's own equipment and services to meet the demand of its customers.

24.    Z-Tel provides unique enhanced services for the telephone.  Today, its innovative offerings include voice-mail that may be accessed over the Internet; "find me" call-forwarding,

which directs calls to multiple numbers when the first number dialed is not answered; and Z-Tel's newest innovation, "Personal Voice Assistant," a unified voice-recognition messaging service that allows subscribers, simply by using their voice, to make calls or retrieve contact information from their "Outlook" or other address book, and to send voice messages by e-mail from any telephone, without using a computer.  SBC does not offer any of these sophisticated services.

25.    As originally conceived, Z-Tel intended to focus solely on developing and providing enhanced services, which would essentially overlay a customer's basic local service. SBC, however, did not welcome competition for enhanced services, the sale of which generated lucrative supra-competitive profits as compared to the regulated rates for basic local service. Knowing that access to and interconnection with its Advanced Intelligent Network ("AIN") , as described below, was required to provide the most advanced enhanced services, SBC refused and continues to refuse access to AIN by Z-Tel.  As a result, Z-Tel was forced to enter the basic local services market as a technological pre-condition to entering the enhanced services market, and even then has been restricted in the enhanced services it can provide.

## II.    <u>The Nature of Trade and Commerce Involved</u>

26.    The relevant product markets at issue in this case are: (1) basic analog local dial-tone service ("basic local service") to residences and small to medium-sized businesses, which is the service of connecting one customer to another within a locality via telephone lines or wires, and (2) "enhanced services," which are additional features that purchasers of basic local service can add to their telephone service, such as voice mail and other features.

### A.    **Basic Local Services Product Market**

27.    Each dial-tone customer has at least one twisted copper pair telephone line ("line") from his or her home or small business, which is connected to a "central office."  These

customer-specific telephone lines are referred to in the industry as the "local loop."  At the telephone company's central office, residential and small business telephone lines converge and are connected to the rest of the local telephone network, much like a hub-and-spoke system.

28.     "Switches" at the central office route incoming calls based on the number dialed, taking the place of the telephone operator of old who manually connected a caller with the recipient of the call.  When a call is made to a customer not connected directly to the caller's central office, the call is transported from the caller's central office to the intended recipient's central office.  In industry parlance, "transport" refers to the transmission facilities that make this connection possible, including telephone poles, conduits, ducts, rights of way, and other hard assets.  If the central offices are not directly connected by transport, then the call is transported to one or more "tandem switches," which are generally contained in intermediary central offices that join central offices and allow a call to eventually be transported to the intended recipient's central office, where it is then connected to the recipient's local loop.  The last elements needed for the actual connection of callers are the "operations support systems," which are the services and equipment necessary to operate, maintain, and repair these assets.

29.     The local loop, the switches at the central office, the transport, the tandem switches, and the operations support systems are all essential to the provision of basic local services to residences and small to medium-sized businesses.  Large businesses requiring multiple lines are not part of the relevant market.  Basic local service to large business may, in some instances, be provided economically by multiple telecommunications carriers, unlike residences and small-to-medium-sized businesses.  It is uneconomic, inefficient, commercially impracticable, and, in most cases, technically infeasible to duplicate the facilities necessary for basic local service, and access to these facilities is thus essential to competing in the provision of

telecommunications services in the basic local services market for residences and small-to-medium-sized businesses.

30. Z-Tel leases access to the essential portions of SBC's network, *i.e.*, the local loops, switches, transport, and operations support systems – so that it may provide basic local services. Standing alone, however, the network made up of these facilities represents only raw capacity, rather than a finished service. To provide basic local service, Z-Tel must combine the leased capacity with, among other things, customer service, account management, and billing and collection. It must also undertake the complicated work of charging (and paying) other carriers for sending and receiving calls. For example, when a competing carrier's customer calls a Z-Tel customer, Z-Tel may be entitled to collect a fee for completing the call. Similarly, Z-Tel may owe such a fee to another carrier when one of its customers calls a customer served by another carrier. Z-Tel operates a large call center and its account management staff comprises the majority of Z-Tel's 1,200 employees. These activities may add as much to the cost of providing basic local service as do the components of the network leased from SBC.

31. In the geographic markets at issue in this complaint, SBC is the sole owner of the facilities required to provide basic local services. SBC, accordingly, is known in industry parlance as the incumbent local exchange carrier, or "ILEC." Z-Tel, along with other entities that seek to compete with an incumbent carrier is known as a competitive local exchange carrier ("CLEC" or "competitive carrier").

### B. Enhanced Services Product Market

32. In addition to basic local service, telecommunications carriers frequently offer customers additional features, such as voice mail, called "enhanced services." These enhanced services are software-based systems that rely in part on the infrastructure necessary to provide basic local service but which also include additional programs and equipment.

33.     Z-Tel provides enhanced services primarily by means of equipment based in Tampa, Florida, that Z-Tel itself owns and does not lease from SBC or any ILEC.  Z-Tel uses the equipment to provide enhanced services that SBC and other ILECs do not even offer.  Z-Tel has invested more than $100 million in enhanced service capabilities alone and employs approximately 100 software developers whose focus is to develop custom, value-added enhanced services.

34.     AIN is an advanced network facility that makes it possible to provide more complex, innovative, and consumer-friendly enhanced services.  AIN uses advanced switch "triggers" – technology that senses various aspects of a customer's call activity – that interface with a carrier's software to get additional "instructions" for the proper routing or processing of the call.  In other words, interconnection with AIN allows carriers to use their own software systems to provide a wide variety of advanced enhanced services to customers.

35.     It is possible to provide rudimentary enhanced services without access to AIN, in conjunction with the provision of basic local service.  More innovative and advanced enhanced services, however, require use of AIN and interconnection with facilities that only incumbent carriers such as SBC control.  For example, access to SBC's essential AIN facilities would allow Z-Tel to provide advanced enhanced services such as voice-activated dialing in place of standard dial tone, whereby a caller could simply speak a name and have the number dialed, or by which a customer could block all calls between midnight and 6:00 a.m. except from pre-approved phone numbers.  AIN access also would allow Z-Tel to provide enhanced services to the customers of other carriers, including SBC, and to manage its customer accounts more efficiently, reducing costs and increasing customer satisfaction.

36.     Because SBC refuses to allow Z-Tel to interconnect with SBC's AIN network, Z-Tel has been forced to enter the basic local services market merely to offer its rudimentary enhanced services.   Z-Tel currently provides non-AIN-required enhanced services in those markets where it provides basic local services.   Z-Tel has been and is prepared to offer, would have offered, and would now offer additional, advanced enhanced services – to both its customers and the customers of other carriers – if it had access to SBC's AIN facilities.

37.     Enhanced services constitute a relevant market because they are recognized in the industry as a separate product, which is not reasonably interchangeable with basic local services.

38.     Although enhanced services can be purchased as a package along with basic local service, access to AIN would make it possible for customers to purchase enhanced services from one carrier while maintaining basic local service from a different carrier, similar to a customer's purchase of long-distance services.   Customers might choose to do this if, for example, a carrier offers a particular enhanced service not available from the customer's basic local service carrier or, if the carrier provides enhanced services more efficiently or at a more competitive price.

**C.     Relevant Geographic Markets**

39.     The relevant geographic market at issue is the SBC incumbent operating territory in the states of Texas, Arkansas, California, Illinois, Indiana, Kansas, Michigan, Missouri, Nevada, Ohio, Oklahoma, and Wisconsin (the "SBC Region").   These are all states in which SBC operates as the incumbent carrier, or ILEC and in which Z-Tel operates as a competitive carrier.   In addition, or in the alternative, providers of the relevant products at issue are generally qualified to do business on a state-by-state basis, and thus the geographic market in which these services are provided is statewide in the incumbent operating territory of SBC.   The incumbent operating territory of SBC in each state therefore may be a separate geographic market, and in

the alternative or in addition, there may be smaller geographic markets or sub-markets within each state.

### III.   SBC's Monopoly and its Long History of Antitrust Scrutiny

40.   For most of the history of telephone service in the United States, the provision of local and long-distance telecommunications services, as well as the sale of telecommunications equipment, was dominated by a single company, AT&T, which owned Southwestern Bell, SBC's predecessor.   Competition was non-existent.   In the 1970's, however, the DOJ sued AT&T, alleging violations of the monopolization provisions of the Sherman Act.   In particular, the DOJ alleged that AT&T had abused its local service monopolies in an attempt to monopolize long-distance service and other markets.   The end result of this suit was the most extreme of judicial remedies: the break-up of AT&T pursuant to a consent decree entered in 1983.

41.   Although this decree introduced competition into the long-distance market and the telephone equipment manufacturing market, the basic local services market remained a bastion of monopoly.   The break-up of AT&T led to the creation of the seven original Regional Bell Operating Companies ("RBOCs"), which continued to provide price-regulated basic local service as monopolists.   Among the original RBOCs were Southwestern Bell (subsequently renamed SBC Communications, Inc.), Ameritech, and Pacific Telesis, the latter two of which both merged into SBC.   Southwestern Bell assumed the local services monopoly in the Southwestern U.S., including the states of Arkansas, Kansas, Missouri, Oklahoma, and Texas. Ameritech assumed the local services monopoly in the Midwestern U.S., which included the states of Illinois, Indiana, Michigan, Ohio, and Wisconsin.   Pacific Telesis assumed the local services monopoly in the Western U.S., including California and Nevada.   The incumbent service in all these states is now controlled by a single company – SBC.

42.     SBC enjoys ownership and control over the ubiquitous physical facilities that form the massive local telecommunications and enhanced services network in the states in which it operates.   Those physical facilities include, among other things, local loops, switches, transport, operations support systems, and AIN facilities.   Without access to these physical assets, competition in the local services markets is impossible.   As a result of its control of those assets, SBC enjoys, on information and belief, a market share of approximately 90% in the basic local services market in all the relevant geographic markets.   Likewise, on information and belief, SBC enjoys approximately the same market share of the enhanced services market in the relevant geographic markets.

## IV.     The Need for Access to SBC's Network

43.     To compete against SBC in the basic local services market in the relevant geographic markets, potential competitors require access to essential facilities, which are part of the local telephone network over which SBC exercises total control: (1) the local loops that connect customers to SBC central offices, (2) switching, (3) "shared transport," or high capacity lines that connect originating and terminating switches and tandem switches, and (4) operations support systems to provide, operate, and repair the local loops.   It is not economically feasible to duplicate SBC's local facilities.   Indeed, SBC has itself recognized that lack of access to switching and shared transport would force a competitor to operate at a 75% cost disadvantage on a statewide basis.   In addition, technological impediments also preclude duplication of particular facilities owned by SBC.

44.     Access to each of these facilities is necessary to ensure that there is a connection between Z-Tel's network and end users.   These facilities, among other elements of SBC's network, are thus absolutely essential to Z-Tel's business and its ability to compete.   To have a meaningful opportunity to compete, Z-Tel's access to these essential facilities must be

dependable, timely, and non-discriminatory.  Delaying access, demanding exorbitant fees, or providing inadequate equipment effectively thwarts competition.  SBC has excess capacity that would permit it to provide access without affecting its own ability to provide basic local and enhanced services to customers.

45.     To compete in the enhanced services market, Z-Tel needs to interconnect its software databases and network with SBC's AIN facilities, including SBC's AIN and signaling databases.  Such access is technologically feasible and can be provided without affecting SBC's ability to service its own customers.  Without access to AIN facilities, however, certain enhanced services and functionalities cannot be provided as a technological matter.  SBC's refusal to provide access to its AIN facilities completely deprives customers of any ability to make use of these competitive services.  Moreover, SBC's AIN facilities cannot be reasonably duplicated.  It is technologically infeasible to control call processing (and hence enable advanced enhanced services) on an SBC end-user's telephone line without the ability to interconnect with SBC's AIN and signaling databases.

## V.     SBC's Predatory Responses to Z-Tel's Competitive Threat

46.     Since 1999, Z-Tel has engaged in a concerted effort to enter the basic local and enhanced services markets in the states in the SBC Region to provide competitive, innovative services to customers in those markets.  In every state in the SBC Region, however, SBC has used its monopoly control over the local network to erect roadblocks to competition.  Implementing a business plan conceived at the highest levels of SBC at its corporate headquarters in San Antonio, Texas, SBC has employed a variety of tactics with one unshakeable goal: to protect and defend the monopoly inherited from AT&T and forestall competitive entry.  To achieve this goal, SBC has undertaken a variety of actions for the sole purpose of preventing the erosion of its monopoly power.  Among other things, SBC has abused its monopoly power by

(1) denying interconnection with SBC's AIN facilities; (2) tying its DSL services to its basic local services; (3) intentionally denying Z-Tel access to the essential network facility of shared transport necessary to establish a competitive alternative for consumers in certain states; and (4) refusing Z-Tel access in other states to shared transport for the slightly narrower, but no less essential, purpose of connecting certain types of toll calls; (5) refusing to deal with Z-Tel despite SBC's voluntary willingness to offer the service to others; and (6) participating in an illegal price squeeze.  Further, SBC has engaged in a deliberate and predatory effort to manipulate its control over the network in ways that raised Z-Tel's costs, to the detriment of Z-Tel's competitive position, by (1) failing to provide timely, accurate, and complete "line loss" information (*i.e.*, information about a customer's choice to switch carriers) and (2) engaging in false and improper billing of Z-Tel; and (3) engaging in an illegal and unfair price squeeze intended to prevent Z-Tel from competing in the market for basic local service.  SBC also has deliberately abused government processes to prevent competitive entry of Z-Tel and other carriers and engaged in a campaign of disparagement and defamation.  SBC's anticompetitive actions involved the sacrifice of short-term profits and goodwill for the purpose of unlawfully preserving SBC's monopoly and thwarting competition in the long-run.

> **A.      SBC's Refusal to Provide Z-Tel With Access to Essential Network Facilities**
>
> **2.      SBC Impedes Z-Tel's Entry Into the Enhanced Services Market by Denying Interconnection With its Advanced Intelligent Network**

47.      With access to and interconnection with SBC's AIN facilities, including AIN and signaling databases, Z-Tel could (1) improve the management of its basic local service subscribers, reducing cost and improving customer service and satisfaction; (2) provide advanced enhanced services to its local service subscribers; and (3) provide advanced enhanced services to the customers of other carriers, including SBC.  In every state in the SBC Region, however, SBC

has refused to provide access to and interconnection with essential AIN facilities required by Z-Tel despite the technical feasibility of such access and interconnection.

48.     AIN facilities allow centralized databases to control call processing and manage network information, as compared with older architectures in which such functions were performed at each individual switch.  An AIN-capable switch halts call progress when a resident software "trigger" is activated and then accesses databases that contain service software and subscriber information for instruction on how to route, monitor, or terminate the call.  If Z-Tel were allowed interconnection with SBC's AIN facilities, calls could be processed by Z-Tel's databases in Florida, allowing Z-Tel to manage its subscriber base more efficiently and to provide advanced enhanced services to the customers of all carriers.  Similarly, instead of hearing a dial-tone when picking up a phone, a customer could be connected directly to Z-Tel's voice-activated dialing, messaging, and contact management services.  For example, for a customer who is delinquent on his bill, such software may be used to route the customer's call to a customer service representative when he attempts to make a call.  Without access to AIN, on the other hand, the only possibility may be simply disconnecting the line of the late-paying customer entirely because there is no way to connect the call to the software database.

49.     Z-Tel's most innovative products are in the enhanced services market and include advanced forms of voice-activated dialing and contact management, voice mail, and the like. The ability to make these services available to consumers, however, is limited by the network architecture of the carrier, and certain enhanced services can only be provided through access to the SBC's AIN facilities.

50.     Despite repeated requests for such access, SBC issued a categorical written denial in 2002, making clear that it would not provide access to AIN under any circumstances or for

any purpose.   While SBC refused, and continues to refuse, to deny Z-Tel's requests to interconnect with SBC's AIN database, SBC discriminatorily allows to others.

51.     Had SBC provided such access, Z-Tel's customer's calls would be routed by SBC's AIN-capable switch to a Z-Tel proprietary central database, making available to Z-Tel's customers the full panoply of its enhanced services.  In addition, access to AIN would allow Z-Tel to provide enhanced services to the customers of other carriers, including SBC.  SBC, however, refused to provide the interconnection requested by Z-Tel.  This refusal was without legitimate business justification and made no sense except as a basis for precluding competition in the basic local and enhanced services markets.  As a consequence of this refusal, Z-Tel was foreclosed from (1) using AIN facilities to manage its subscriber base; (2) providing advanced enhanced services to its local service subscribers; and (3) providing advanced enhanced services to customers of other carriers, including SBC.  Customers of all carriers, including SBC, were denied the ability to choose Z-Tel's innovative products.  As a result, SBC maintained and strengthened its monopoly in the enhanced services markets in the SBC Region.

> **3.      SBC Unlawfully Preserves and Maintains its Basic Local Services Monopoly by Prohibiting its DSL Customers From Changing Their Basic Local Services Carrier from SBC**

52.     Another method that SBC uses to stifle competition and preserve and maintain its monopoly in the basic local services market is to tie its DSL internet service to its basic local services.  Throughout the SBC Region, SBC has refused to sell DSL to customers who purchase basic local services from another provider, such as Z-Tel.  Even more perniciously, when a current SBC DSL subscriber elects to change its basic local services provider to Z-Tel, SBC either cancels the customer's DSL service, or refuses Z-Tel the right to provide basic local services to that customer.  It is technically feasible for SBC to provide DSL to a customer served by a different provider of basic local analog dial tone service, but SBC refuses to do so.

53.     SBC has adopted this strategy in order to maintain its monopoly power in the basic local services market and the enhanced services market by an effort to impose high switching costs on its DSL subscribers, thereby limiting the ability of Z-Tel to serve potential customers, even if those customers would prefer to use Z-Tel as their basic local and enhanced services provider.  SBC's conduct is without legitimate business justification because its refusal to provide DSL to customers who purchase basic local services from other providers sacrifices that profit for the greater profits it can make by preventing competition in the basic local and enhanced services markets.

**4.     SBC Blocks Z-Tel's Entry Into the Basic Local and Enhanced Services Markets by Denial of Shared Transport**

54.     While the denial of AIN access and the tying of DSL and basic local service has occurred SBC-wide, other exclusionary conduct by SBC has targeted certain states to thwart competition in the basic local and enhanced service markets.  For example, when Z-Tel first sought in November of 1999 to expand its operations to the SBC Region in both the basic local services market and the enhanced services market, it sought entry in the Illinois and Michigan markets.  Z-Tel's planned entry into these two states, however, was blocked by SBC in a particularly blatant way.

55.     Z-Tel planned to lease access to the essential facilities of SBC's network in Illinois and Michigan, including loops, switching, shared transport, and operations support systems.  Although SBC offered access to its shared transport facilities in some other states, it had made clear to all competitive carriers that it would not provide such access in Illinois and Michigan, rendering the other facilities it provided useless.  SBC had a publicly disclosed policy of refusing access to shared transport in Illinois and Michigan during this period to all competitive carriers.  In light of this policy, it was clear that any request for access would have

been futile for Z-Tel.  The refusal to provide such access sacrificed short-term benefits and makes business sense only as a scheme to reduce competition in the long-run in the basic local and enhanced services markets.

56.     SBC's refusal to provide Z-Tel with access to the essential element of shared transport was part of its concerted effort to prevent Z-Tel's competitive entry into the market place and to otherwise injure its ability to compete.  Its refusal is even more egregious because the FCC, Illinois Commerce Commission, and Michigan Public Service Commission had all previously ordered SBC to provide shared transport.  That SBC nonetheless denied competitive carriers access to shared transport illuminates how far SBC was willing to go to preserve its monopoly, ignoring not simply the antitrust laws, but also express orders of federal and state agencies.

57.     SBC's continuing refusal to provide shared transport to Z-Tel also became a substantial concern when SBC and Ameritech announced their planned merger on or about May 10, 1998.  The merged company controls approximately one-third of the local access lines in the United States.   Realizing the negative competitive effects of this merger, the FCC imposed stringent requirements on SBC as conditions for the approval of the merger.  Perhaps the most important of those conditions required SBC to make shared transport available to Z-Tel and other competitive carriers on a "substantially similar" basis, including rate and rate structure, to SBC's shared transport product in Texas.  The Illinois Commerce Commission imposed a similar condition and went so far as to order SBC to file a tariff satisfying that condition.

58.     Although SBC filed an interim tariff with the Illinois Commerce Commission for the provision of shared transport on September 21, 1999, the tariff discriminatorily imposed rates that were 16 times SBC's rate in Texas, in direct violation of the order of the Illinois

Commerce Commission and the FCC's merger condition.  Days later, SBC filed a similarly inflated interim tariff with the Michigan Public Service Commission.

59.     As a result, when Z-Tel sought to enter the Michigan and Illinois markets in November of 1999, it confronted an incumbent Bell operating company – SBC – arrogantly acting in blatant disregard of the law.  The "permanent" tariff, which took effect on October 8, 2000, imposed rates that were still twice the rates charged in Texas, a direct violation of the Illinois Commerce Commission's order.  Michigan's "permanent" shared transport tariff likewise exceeded the SBC Texas rate.  Z-Tel's actual market entry was thus delayed by SBC until about November 2000.

60.     Once SBC finally began providing access to shared transport, albeit at inflated and discriminatory rates, SBC undertook other foot-dragging efforts to impede Z-Tel's ability to enter the Illinois and Michigan markets and to compete effectively.  For instance, in order to design the operations support systems necessary to service the leased facilities, SBC was required to work cooperatively with Z-Tel to develop what is known as an Electronic Data Interchange ("EDI") interface.  As any good business would do, Z-Tel sought to test the EDI systems and SBC's operations before launching its service.  However, SBC refused to cooperate in this testing and instead required Z-Tel to order lines (from SBC, of course) for two Chicago-based contractors.  Even after such accounts were set up, SBC delayed the scheduling of its installation of the test loops by approximately a month; final installation of the test lines was delayed approximately two months.  Even after installation, several requested features of the lines did not function.

61.     In addition, SBC unilaterally imposed a requirement that Z-Tel establish a dedicated billing circuit for billing data and daily usage files before Z-Tel's submission of test

orders using EDI.  This requirement was not disclosed in any of the materials provided by SBC in preparation for meetings with Z-Tel.  By failing to disclose this information until the last minute, SBC further impeded Z-Tel's entry into the market.

      **5.**      **SBC Denies Access to Shared Transport for the Purpose of Connecting IntraLATA Toll Calls**

      62.      In other states, SBC invoked a different, but no less predatory and exclusionary, strategy to foreclose competition.  Instead of denying access to shared transport entirely, as was done in Illinois and Michigan, SBC refused access to shared transport for so-called "intraLATA" toll calls only.

      63.      In 1984, to implement the consent decree breaking up AT&T, the DOJ divided the nation into 197 Local Access Transport Areas ("LATAs").  The regional bell operating companies were authorized to provide long-distance service among cities within the same LATA, but not between cities in different LATAs.  For true long distance service, *i.e.*, *inter*LATA service, it is possible to have competition, and companies such as AT&T and Sprint provide such services using certain of their own long-distance transport facilities, while leasing access to the local loops, for example, from the regional bell operating companies.  For long distance service between cities within the same LATA, however, *i.e.*, *intra*LATA toll service, all of the shared transport facilities are owned by the incumbent carrier, and it is not economical to duplicate them.  SBC refused to provide access to shared transport for intraLATA toll service, though it would provide shared transport for intraLATA local service, *i.e.*, calls within the same city or area that are not toll calls.  SBC adopted this approach in all of its states except for Texas, including Arkansas, California, Indiana, Ohio, Wisconsin, and, for a shorter time, Kansas and Oklahoma as well.  Even in Michigan and Illinois, once SBC began making a rudimentary form of shared transport available, it still refused to provide intraLATA toll functionality.

64.     SBC's refusal to provide access to shared transport for intraLATA toll calls was a substantial impediment to Z-Tel's competing in these markets.  SBC's conduct had no legitimate business purpose except precluding competition in the basic local and enhanced services markets.

65.     Without access to shared transport for intraLATA toll calls, Z-Tel was forced to route its intraLATA toll calls through an interexchange carrier, *i.e.*, a long-distance provider such as AT&T.  Routing intraLATA toll calls through an interexchange carrier imposed much higher costs, and created a much higher risk of call degradation and failure.  In other words, instead of routing an intraLATA toll call from the central office at the end of the dialing party's local loop through SBC's shared transport network to the central office at the end of the receiving party's local loop, as SBC did for itself, the call was routed from the dialing parties' local loop to the interexchange carrier's network and from the interexchange carrier's network to SBC's central office at the end of the receiving party's local loop.

66.     By forcing Z-Tel to provide intraLATA service through an interexchange carrier's central office, rather than through SBC's shared transport, SBC imposed additional direct and indirect costs on Z-Tel that SBC did not have to bear.  Z-Tel incurred access fees that SBC charges on each intraLATA toll call routed through an interexchange carrier that terminates to an SBC end-user, which Z-Tel would not have had to pay had Z-Tel been granted access to shared transport on a non-discriminatory basis for intraLATA toll calls.  Z-Tel also incurred fees charged by the interexchange carrier.

67.     The indirect costs imposed on Z-Tel by SBC's scheme included increased call degradation and risk of call failure, both resulting from greater transmission complexity.  Routing intraLATA toll calls through an interexchange carrier requires as many as seven

additional network facilities that would not otherwise be necessary if shared transport were available. Because each facility adds an additional point of potential network failure, the introduction of each additional facility in a call circuit diminishes the quality of call service that Z-Tel can provide and increases the risk that the call will not be completed at all.  Additionally, SBC's conduct required Z-Tel to administer unnecessary contractual arrangements with an interexchange carrier.

68.     SBC had no lawful basis to deny shared transport for intraLATA toll calls.  On March 19, 2001, the Michigan Public Services Commission ordered SBC to provided shared transport for intraLATA toll calls in Michigan, and SBC ultimately complied in May 2001.  SBC subsequently permitted access to shared transport for intraLATA toll calls in Illinois in October 2001, and in Indiana, Ohio, Wisconsin, California, and Arkansas on November 25, 2002, only after the FCC had entered yet another order.

69.     SBC's conduct in this regard is particularly egregious, not only because it violates the antitrust laws, but also because it violates an express condition of the FCC's merger approval order in connection with SBC's merger with Ameritech that SBC purported to propose voluntarily.  As described above, the FCC expressed severe concerns about the anticompetitive consequences of the SBC-Ameritech merger.   The merger was approved only with the imposition of conditions designed to counter-balance these harmful effects, including the provision of shared transport on terms similar to those pursuant to which shared transport was provided in Texas, a requirement SBC claimed it was not obligated to perform under the Telecom Act, but nonetheless voluntarily agreed to subject itself to.

70.     Post-merger, SBC has failed to live up to the condition it voluntarily offered, as the FCC itself has found.  The FCC found that SBC had "willfully and repeatedly" violated

conditions of the SBC-Ameritech merger and imposed a forfeiture order of $6 million on SBC for these violations.  Although SBC provided the FCC with declarations stating that its personnel understood the merger condition only to apply to shared transport for local exchange calls, and not for intraLATA toll calls, the FCC stated that "[t]hese self-interested declarations . . . cannot serve to contradict the plain language of the merger condition" and stated that "the language of the condition admits no reasonable contrary interpretation."

> **6.      SBC Has Engaged in Exclusionary Conduct by Refusing to Deal with Z-Tel Despite SBC's Voluntary Willingness to Offer the Same to Others**

71.     Both before and after the enactment of the Telecom Act, SBC has sold access to its network elements, including shared transport, to neighboring carriers to route the carriers' calls through SBC's switches and shared transport network.

72.     In addition, prior to the enactment of the Telecom Act, SBC voluntarily planned to offer shared transport and other network elements for sale to its rivals, and it would have done so absent the statutory compulsion of the Telecom Act.  SBC subsequently denied such access to Z-Tel without any justification other than the desire to maintain its monopoly power.

73.     After the Telecom Act was enacted, SBC took the position that it was not compelled by the statute to offer shared transport.  As described above, SBC defied repeated orders by federal and state agencies to the contrary.  In connection with the SBC-Ameritech merger, however, SBC offered to make shared transport available, on what it publicly contended was a voluntary basis, in order to satisfy the FCC that the merger was not anticompetitive.

74.     More recently, SBC entered into a private wholesale agreement outside of the regulatory regime of the Telecom Act with a rival telecommunications carrier.  Z-Tel sought to engage in similar negotiations with SBC, but SBC refused to deal with Z-Tel without legitimate business justification and instead, "negotiated" only to the extent consistent with its intent of

preserving its monopoly power in the basic local telephone market.  Among other things, SBC refused to negotiate in good faith and demanded not only an arbitrarily and unreasonably high contract price, but also terms that were completely not viable to Z-Tel.

75.     The services that SBC unlawfully denied to Z-Tel for an extended period of time in 1999 and 2000 and the services it seeks by negotiation with SBC since 2004 are marketed or available to the public other than under compulsion of the Telecom Act.  Before its enactment, SBC evinced an intent to make these services available voluntarily.  After the Telecom Act was enacted, SBC evinced an intent to make these services available voluntarily.  And, in 2004, SBC followed through on its consistently expressed view that voluntary provision of these services was both feasible and profitable by entering into a self-proclaimed private commercial agreement with a competitor of Z-Tel's for these very services.

### 7.     SBC Has Engaged in Exclusionary Conduct by Participating in an Illegal Price Squeeze Designed to Exclude Competition

76.     In a further effort to exclude competition, SBC has engaged in an illegal price squeeze in 2004 designed to achieve anticompetitive results to preclude Z-Tel from competing in the market for basic local service.  SBC has offered to lease elements of SBC's network at unfair wholesale prices set by SBC.  In contrast, SBC offers to retail customers rates that are believed to be significantly below its reasonable costs.  In particular, SBC's own retail prices for local phone service in certain areas are so low relative to its unbundled wholesale prices, the rate at which Z-Tel can lease portions of SBC's network, that Z-Tel cannot meet SBC's retail prices and still make a reasonable return on its investment.  If Z-Tel charged retail customers the same price SBC does, Z-Tel could not recover the cost of providing the service.  The end result is an illegal price squeeze in which SBC has taken advantage of Z-Tel's status as both a competitor and a customer.

**B.     SBC's Abuse of its Network Ownership to Raise Z-Tel's Costs and Exclude Competition**

77.     SBC has abused its ownership of the essential network facilities through a conscious scheme designed to raise Z-Tel's costs in order to maintain or enhance SBC's monopoly power and to engage in other exclusionary conduct.  Examples of this scheme include, but are not limited to, its failure to provide complete, accurate, and timely line loss information and its false and fraudulent billing practices.

**1.     SBC has Engaged in Exclusionary Conduct With a Strategy to Increase Z-Tel's "Churn" Rate by Failing to Provide Complete, Accurate, and Timely Line Loss Information**

78.     Because Z-Tel is providing local exchange services by leasing access to certain essential inputs owned by SBC, Z-Tel does not control the switches serving each of its customers and cannot detect when a customer has decided to switch carriers.  Z-Tel relies on access to SBC's operational support systems to inform Z-Tel when a Z-Tel customer has elected to change service providers.  This information is known as "line loss" information.  If SBC does not provide this information from its operational support systems in a complete, accurate, and timely fashion, it causes Z-Tel to improperly bill former customers after their discontinuance of Z-Tel service, leading to billing disputes, customer complaints, regulatory complaints, and the like, all of which impose substantial costs on Z-Tel and harm its reputation in the marketplace.  As the Illinois Commerce Commission has specifically recognized, such actions have "an adverse effect on the ability of Z-Tel to provide service to its customers."

79.     SBC has adopted as a business strategy an effort to increase the "churn rate" of Z-Tel's (and other competitive carriers') customers.  According to a Bank of America Securities Equity Research Report, "SBC's strategy for winning the battle on the local service frontier is premised not necessarily on winning back all customers lost, but increasing its competitor's

churn rate."  The Report indicated that SBC believed that "alternative carriers incur substantial up-front nonrecurring customer acquisition costs that will become too prohibitive" if customers can be induced to switch carriers frequently.  According to the Report, SBC has concluded that if it can increase "churn rates from 3% to 5% it can severely impair" the competitive carrier's ability to compete – in other words, drive Z-Tel out of the market or substantially undermine its competitive threat.

80.     To provide line loss information from its operations support systems, SBC submits electronic reports to Z-Tel (and to other competitive carriers).   In the beginning, however, SBC provided no line loss information at all to Z-Tel.  From December 2000 through April 2001, Z-Tel worked with SBC to develop and test SBC's line loss reporting systems.  Although it was receiving "reports" at this time, they did not contain any actual data.  Z-Tel finally began receiving reports with data in May 2001, but these reports were riddled with errors.  Between December 2000 and February 2002, Z-Tel complained to SBC about problems with the line loss notification more than 75 times.

81.     The problems occurred throughout the SBC Region, but were particularly egregious in Illinois and Michigan.  Customer records were mislabeled at rates in excess of 60% in some months and were not timely delivered under SBC's own standards at rates approaching 90% in several months.

82.     The negative consequences on Z-Tel of these errors take several forms.  First, accurate and timely information on disconnections by customers is necessary for Z-Tel to audit the charges of SBC for the essential network facilities that Z-Tel leases because many of these charges are measured on a per-customer basis.  Such audits are necessary to ensure that SBC does not charge Z-Tel for facilities used to serve customers who are no longer Z-Tel customers.

A sample audit for the time period between October 2001 and January 2002 showed that SBC incorrectly billed Z-Tel by charging it for at least 2,623 lines in Illinois that were not being used by Z-Tel at the time.

83.     A second negative consequence to Z-Tel of erroneous and untimely provision of line loss notification relates to consumer complaints.  SBC has acknowledged that its line loss notification failings have caused Z-Tel and other competitive carriers to bill customers for services subsequent to the time at which they switched to another carrier.  Customers can then be double-billed.  Some of these customers complain directly to Z-Tel, while others make formal complaint to state or federal agencies such as the Texas Public Utility Commission or the FCC. Either way, such complaints cause Z-Tel to incur costs in responding to these complaints and damage Z-Tel's reputation with former, present, and prospective customers.

84.     These problems have occurred throughout the SBC Region.  In Michigan, for example, inaccurate line loss notification exceeded 70%, and delayed line loss notifications routinely approached 90%, resulting in an inordinate amount of customer complaints for double billing.  The Michigan Public Service Commission stated that "this problem has a grave potential effect on competition for local exchange service" and declared that SBC's conduct in this regard was "an egregious and anticompetitive neglect of [its] duty."  The DOJ agreed.  It opposed a subsequent request for approval by SBC from the FCC to provide interLATA service in Michigan because it concluded that SBC had not demonstrated that it had complied with the requirements of introducing competition into its Michigan territory, citing, among other things, SBC's billing errors and line loss notification procedures.

85.     SBC's repeated and flagrant failures with respect to line loss notification throughout the SBC Region is not mere incompetence.  SBC's anticompetitive intent is apparent

from the efficiency with which it manages to transmit this information to its own retail marketing

operations when the migration is from SBC to another carrier.  When an SBC customer switches

to Z-Tel or another competitive carrier, SBC manages to distribute marketing and promotional

materials to the lost customer within a few days of the switch, offering incentives if the former

SBC customer switches back to SBC.

86.     Moreover, SBC has discriminated in favor of its own retail marketers as

compared to Z-Tel and other carriers in terms of the substance of the information provided when

line losses occur.  Whereas the line loss notification to Z-Tel included only a working telephone

number, the order number for the disconnect, and the date of the disconnect, SBC provided its

marketers with a detailed summary of the customer they lost to help SBC win back that

customer.  Among the additional information that SBC provided to its own marketers, but not to

Z-Tel, is information on how the customer is billed, the services actually provided to the

customer, and a description of the customer's reasons for cancellation.  SBC has used this

additional information to secure for itself a competitive advantage in winning back customers

who intended to leave SBC for a competing carrier's services and thus to discriminate against the

potential competitor.

**2.      SBC has Engaged in Exclusionary Conduct by Increasing Z-Tel's Costs and Harming its Business Reputation Through False and Fraudulent Billing Practices**

87.     SBC refuses to provide accurate and auditable bills for the network facilities Z-

Tel leases and refuses to provide call records and other information regarding alternatively billed

services, cellular calls, and other types of transactions in an accurate manner and according to

industry standards.  SBC often bills Z-Tel for items it has not ordered or received and bills Z-Tel

incorrect rates and charges for items Z-Tel has ordered.  In addition, SBC's bills lack any cross

references to the applicable tariff or interconnection agreement that is the source of particular

charges.  As a result, Z-Tel had literally hundreds of billing disputes with SBC and was forced to expend undue resources on deciphering SBC's bills.  Moreover, even with Z-Tel's inordinate efforts to verify SBC's bills, it is likely that there are additional amounts for which Z-Tel has been falsely billed that Z-Tel has simply been unable to detect due to the poor quality of the billing information that SBC provides.  A consequence of the dearth of information is that Z-Tel is unable to properly bill third parties.

88.     Further, even after Z-Tel informed SBC of its false invoices and billing inaccuracies, SBC has repeated the false billing in subsequent months for numerous items. Similarly, SBC has, in certain states, billed Z-Tel for items for which it is not entitled to bill under explicit state commission orders, and then threatened to disconnect Z-Tel's customers and refused to accept new service orders from Z-Tel when Z-Tel refused to pay such amounts (even when such amounts were less than $5,000.00).  SBC's conduct is nothing more than a thinly veiled effort to use manufactured billing disputes as a basis for accomplishing its anti-competitive ends.  Thus, SBC's conduct in submitting false bills to Z-Tel is intentional and/or reckless.

89.     SBC also fails to provide call records and other information regarding cellular calls, alternatively billed services, and other types of transactions in an accurate manner and according to industry standards.  Despite this failure, SBC still demands that Z-Tel collect certain fees related to such calls on SBC's behalf.  SBC also has engaged in "self-help," refusing to pay Z-Tel amounts owed for terminating the calls of SBC subscribers in retaliation for other types of billing disputes submitted by Z-Tel.

90.     Nor does SBC have in place an efficient mechanism to resolve billing disputes. Often, SBC's billing analysts have insufficient knowledge or understanding of the essential

network facilities and the corresponding rate elements that apply for providers such as Z-Tel.  Z-Tel's complaints about SBC's billing practices are not merely routine performance disputes. They constitute a direct and substantial means by which SBC maintains its monopoly power in the local dial-tone and enhanced services markets.  By maximizing inefficiencies in resolving billing disputes, SBC is able to impose greater costs on Z-Tel and other competitive carriers, thereby impeding their ability to compete.  Since many of the contracts Z-Tel has with SBC require Z-Tel to pay disputed bills pending resolution, this strategy by SBC ties up substantial operating funds of Z-Tel.

91.    The failure of SBC to provide accurate and timely bills and call records to Z-Tel unduly hinders Z-Tel's business operations and planning and, thus, its ability to provide service in competition with SBC.  The DOJ and the FCC have both recognized that improper billing can have a substantial anticompetitive effect; indeed, the DOJ has acknowledged that "proper billing is essential to competition" and that "[a]ccurate and auditable electronic bills are an important factor in making local telecommunications markets fully and irreversibly open to competition." Both agencies have recognized "that undependable billing diverts CLEC resources to bill reconciliation and bill correction, hampers CLEC ability to raise capital because improper overcharges are carried on the CLEC's financial reports, diminishes CLEC capacity to adjust prices and expenses in response to competition, and deprives CLECs of revenue because they are unable to backbill previously undercharged end users."

92.    SBC's failure, moreover, to provide accurate line loss and billing information is consistent with its other reporting tactics.  As a former SBC employee in Dallas, Texas, recently explained, he was "regularly requested to make a false record with respect to the timeliness of [SBC's] responses to orders" by competitive carriers for service.  To justify such anti-

competitive conduct, which the former employee believed violated federal mail and wire fraud statutes, he was told by a supervisor at SBC that "it was in the interest of [SBC] that competition in the local exchange and long distance business be limited.

### C.     SBC's Abuse of Government Processes

93.     SBC refused to provide shared transport generally in Illinois and Michigan, and refused to provide shared transport for intraLATA toll calls in those and other SBC states in direct and flagrant violation of repeated orders of both federal and state authorities.  The FCC, the Illinois Commerce Commission, and the Michigan Public Service Commission all repeatedly ordered SBC to provide shared transport.

94.     Nonetheless, SBC continued to contend it was not required to provide shared transport in numerous proceedings before the agencies, thereby manipulating the administrative process, not because of the existence of any legitimate dispute on the merits, but instead to use the proceedings themselves as a means of foreclosing competition in the relevant markets.  In 1998, for example, the Illinois Commerce Commission found that "Ameritech Illinois [*i.e.*, SBC] has been quite zealous in resisting the notion of providing [shared] transport" and "that Ameritech Illinois' positions . . . are inconsistent with prior Commission Orders."  Subsequently, on SBC's third trip before the commission on this issue, the Commission stated that SBC's arguments against its obligation to provide shared transport were "wholly disingenuous and designed to stave off the inevitable conclusion" that SBC failed to comply with the commission's prior orders.  In fact, the Illinois Commerce Commission believed that SBC had "gamed the system" and concluded: "The real question is not whether [SBC's conduct] complies with our prior orders, but how many prior orders it defies."

95.     The FCC also recognized SBC's ulterior motive in its regulatory filings. According to the FCC, "[i]n state after state, . . . SBC forced competing carriers to expend time

and resources in state proceedings trying to obtain what SBC was already obligated to offer, causing delays in the availability of shared transport."  The FCC further recognized that this conduct was designed to affect competition: "the potential competitive impact of SBC's violation is substantial."

96.     SBC is not shielded from antitrust liability pursuant to the *Noerr-Pennington* doctrine for this conduct for numerous reasons as a matter of law and as a matter of fact, including, but not limited to, that SBC initiated and maintained objectively baseless regulatory proceedings.  In addition, the course of conduct and particular acts alleged herein constitute a pattern of abusive conduct made without regard to the merits that used administrative processes (as opposed to the outcome of those processes) as an anticompetitive weapon.  This pattern of abusive conduct falls outside any petitioning privilege under the *Noerr-Pennington* doctrine.

### D.    SBC's Campaign of Defamation and Disparagement

97.     SBC has also engaged in a deliberate and malicious effort to defame and disparage Z-Tel's business and the business of other competitive carriers through a campaign of public advertising containing false statements and representations.  In these advertisements, SBC characterizes competing carriers such as Z-Tel as "parasites" who "give nothing back" and who "invest nothing in the networks," despite the fact that any network facilities that are leased are paid for at rates that regulatory agencies have approved to include a reasonable profit.

98.     SBC also states that "SBC is a real phone company," falsely implying that competing carriers are not, and calls competing carriers "middlemen" despite the value-added services that Z-Tel combines with facilities leased from SBC to provide basic local and enhanced services.

99.     In other advertisements, SBC falsely accuses competing carriers of "go[ing] for short term profits at the expense of what's best for their customers" and making "flashy moves to

dazzle Wall Street" as compared to SBC "mak[ing] multi-year, multi-billion dollar commitments
to develop new technologies for Main Street."

**VI.     Impact on Z-Tel and Consumers**

100.    The effect of SBC's unlawful practices is as immediate as it is obvious – SBC has
grievously injured competition and greatly harmed Z-Tel by excluding it from the marketplace.
SBC did everything it could to prevent Z-Tel from gaining any significant share of the market in
the SBC Region.  From the beginning, Z-Tel was met with stall tactics, delays, and refusals to
provide essential facilities, as well as fraudulent and false information designed to increase the
costs of Z-Tel doing business in the SBC Region.

101.    Overall, the effect on Z-Tel was severe.  SBC's conduct delayed Z-Tel's
introduction of service by over a year at the outset, imposed other hurdles since that have greatly
reduced Z-Tel's market shares in the enhanced services and basic local service markets, reduced
Z-Tel's revenues, and significantly increased its costs.  At the same time, SBC succeeded in
using its monopoly control over essential facilities and the basic local services markets to
solidify its dominance in the enhanced services market, forcing Z-Tel to enter the basic local
service market in order to compete in the enhanced services market.

102.    As a direct and proximate result of SBC's unlawful conduct, Z-Tel's market entry
has been impeded and frustrated, and Z-Tel has been foreclosed from the relevant markets and
has lost substantial sales, profits, and the value of its business.  Z-Tel has suffered and will
continue to suffer harm through loss of and injury to its trade and business in that (a) Z-Tel has
been and will be precluded from entering into contracts for the sale of competitive basic local
and enhanced services; (b) Z-Tel has been and will be precluded from carrying out contracts
already entered into for the sale of competitive basic local and enhanced services; (c) Z-Tel has
been and will continue to be harmed in its reputation and goodwill; and (d) Z-Tel and other

competitive service providers will be hampered in marketing, selling and providing their services.

103.    SBC's conduct has harmed competition and consumers in that it has had and will continue to have the effects of (a) denying Z-Tel access to the basic local and enhanced services markets; (b) denying consumers free choice in the basic local and enhanced services markets; (c) affecting a substantial amount of commerce in the basic local and enhanced services markets; (d) substantially lessening competition and tending to create or maintain a monopoly in the basic local and enhanced services markets; (e) creating higher prices for basic local and enhanced services; (f) forcing consumers to use inferior basic local and enhanced services; and (g) stifling the development of new and better basic local and enhanced services.

## FIRST CAUSE OF ACTION
### SHERMAN ACT, SECTION 2, 15 U.S.C. § 2 – MONOPOLIZATION

104.    Z-Tel incorporates by reference the allegations of paragraphs 1 through 103 of this Complaint, as though fully set forth here.

105.    SBC has monopoly power in both the basic local and enhanced services markets in each relevant geographic market and in the entirety of the SBC Region.  Among other things, SBC owns and controls the only ubiquitous physical local telecommunications and enhanced services network within the SBC Region.

106.    SBC has engaged in the anticompetitive conduct described above with the specific intent to maintain and extend its monopoly power and position in the basic local service and enhanced services markets.  SBC's conduct has delayed and prevented Z-Tel's entry into these markets in one or more relevant geographic markets.  SBC continues to dominate these markets through exclusionary conduct, to the detriment of consumers and competition.

107.    As a direct and proximate result of SBC's monopolistic conduct, competition in the relevant markets has been injured, consumers have been damaged, Z-Tel has been injured, and Z-Tel has been damaged in that: (i) its costs of operation have increased; and (ii) its ability to penetrate SBC's monopolies has been frustrated and delayed, causing Z-Tel to lose potential customers and profits and harming Z-Tel's goodwill and reputation.  Z-Tel has been damaged in its business operation and has sustained damages and continues to sustain damages in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**SHERMAN ACT, SECTION 2, 15 U. S. C. § 2 – ATTEMPTED MONOPOLIZATION**

108.    Z-Tel incorporates by reference the allegations of paragraphs 1 through 107 of this Complaint, as though fully set forth here.

109.    SBC has engaged in the anticompetitive conduct described above in a willful effort and attempt to gain or continue a monopoly with the conscious object of acquiring the power to control prices or to exclude or destroy competition in both the basic local services market and in the enhanced services markets in one or more of the relevant geographic markets.

110.    There is a dangerous probability that SBC will succeed in its efforts to gain, perpetuate or enhance a monopoly in the basic local and enhanced services markets in one or more of the relevant geographic markets.  SBC continues to dominate those markets through unlawful conduct, to the detriment of consumers and competition.

111.    As a direct and proximate result of SBC's monopolistic conduct, competition in the relevant markets has been injured, consumers have been damaged, and Z-Tel has been damaged in its business or property in that: (i) its costs of operation have increased significantly; and (ii) its ability to penetrate SBC's monopolies has been frustrated and delayed, causing Z-Tel

to lose potential customers and profits and harming Z-Tel's goodwill and reputation.  Z-Tel has sustained damages and continues to sustain damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### SHERMAN ACT, SECTION 2, 15 U. S. C. § 2 – MONOPOLY LEVERAGING

112.    Z-Tel incorporates by reference the allegations of paragraphs 1 through 111 of this Complaint, as though fully set forth here.

113.    SBC has monopoly power in the basic local service market by virtue of its ownership of the physical assets necessary to participate in that market, including local loops, switching, transport, AIN facilities, and operational support systems.   In addition, SBC has market power in the market for DSL service or, alternatively, the market for broadband internet access.

114.    SBC uses its monopoly power in the basic local services market to gain an unlawful, competitive advantage in the enhanced services market.  In particular, as described above, SBC uses its monopoly power in the basic local services market to deny and delay Z-Tel's ability to combine basic local service with enhanced services, to prevent Z-Tel from providing enhanced services to the customers of other carriers, including SBC, to increase Z-Tel's costs in providing enhanced services relative to SBC's costs, and to limit Z-Tel's access to information on a timely basis that would allow it to contact potential customers relative to SBC's provision of the same information to its retail marketers.

115.    SBC also uses its monopoly power in the market for DSL service or, alternatively, the market for broadband internet access to gain an unlawful, competitive advantage in the basic local services market.  In particular, as described above, SBC uses its monopoly power in the market for DSL service or, alternatively, the market for broadband internet access to deny and delay Z-Tel's ability to provide basic local service to customers of SBC's DSL service.

116.   The unfair competitive advantage that SBC creates for itself derives from its monopoly power in the basic local services market, and thus constitutes monopoly leveraging.

117.   As a direct and proximate result of SBC's monopolistic conduct, competition in the relevant markets has been injured, consumers have been damaged, and Z-Tel has been damaged in its business or property in that: (i) its costs of operation have increased significantly; (ii)  Z-Tel has lost customers and profits; and (iii) Z-Tel's goodwill and reputation have been harmed.  Z-Tel has sustained damages and continues to sustain damages in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
### SHERMAN ACT, SECTION 1, 15 U. S. C. § 1 – TYING

118.   Z-Tel incorporates by reference the allegations of paragraphs 1 through 117 of this Complaint, as though fully set forth here.

119.   SBC requires customers of its DSL service to agree to purchase basic local service only from SBC and not from any competitive carrier in a deliberate effort to preserve and maintain its monopoly in the basic local and enhanced services market.  If an SBC DSL subscriber attempts to change carriers from SBC to Z-Tel, SBC will either terminate the customer's DSL access, or will deny Z-Tel the ability to provide basic local service to that customer.

120.   The relevant tying market is the market for DSL service and the market for broadband internet access.  The relevant tied markets are the basic local services market and the enhanced services market.  SBC has appreciable economic power in the relevant tying market and uses that market power to force customers of its DSL service to purchase its basic local and enhanced services and to maintain its monopoly power in the basic local and enhanced services markets and thereby affects a substantial volume of commerce in those markets.  SBC's tying

scheme imposes prohibitively higher switching costs on customers in order for SBC to maintain or expand its monopoly power in the basic local and enhanced services markets.  Were it not for SBC's illegal tying arrangement, some customers would purchase basic local and enhanced services from carriers other than SBC.

121.    In addition, SBC has tied its basic local service to its enhanced services, and its enhanced services to its basic local service.  SBC has appreciable economic power in both the basic local and enhanced services markets and uses that market power to force customers of its basic local service to purchase enhanced services only from SBC, as well as to force customers who want SBC's enhanced services to purchase basic local service only from SBC.  SBC will not sell basic local service to customers unless they agree not to buy enhanced services from Z-Tel and other competing carriers (and, indeed, SBC makes such purchases impossible by refusing to provide access to AIN to Z-Tel and other competing carriers).  SBC, likewise, will not sell enhanced services to customers unless they agree to purchase their basic local service from SBC.

122.    As a direct and proximate result of SBC's conduct, competition in the relevant markets has been injured, consumers have been damaged, and Z-Tel has been damaged in its business or property in that: (i) its costs of operation have increased significantly; (ii)  Z-Tel has lost customers and profits; and (iii) Z-Tel's goodwill and reputation have been harmed.  Z-Tel has sustained damages and continues to sustain damages in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION
### RICO VIOLATION

123.    Z-Tel incorporates by reference the allegations of paragraphs 1 through 122 of this Complaint, as though fully set forth here.

### A.    Enterprise

124.    Defendants were associated with an enterprise engaging in, and the activities of which affect, interstate commerce.

125.    Each subsidiary of SBC, Ameritech, Illinois Bell, Michigan Bell, Indiana Bell, Ohio Bell, and Wisconsin Bell, constitutes an enterprise.   In the alternative, the enterprise consists of an association-in-fact of SBC and its subsidiaries, Ameritech, Illinois Bell, Indiana Bell, Michigan Bell, Ohio Bell, and Wisconsin Bell.   Further, and in the alternative, there are separate association-in-fact enterprises in each state consisting of SBC, Ameritech, and the respective subsidiary defendant which is the operating company for that state as recognized under 18 U.S.C § 1961(4), such that there are associations-in-fact: (1) in Illinois, consisting of SBC, Ameritech, and Illinois Bell; (2) in Indiana, consisting of SBC, Ameritech, and Indiana Bell; (3) in Michigan, consisting of SBC, Ameritech, and Michigan Bell; (4) in Ohio, consisting of SBC, Ameritech, and Ohio Bell; and (5) in Wisconsin, consisting of SBC, Ameritech, and Wisconsin Bell.   The relationship among the members of each association is continuous and each enterprise and association in fact enterprise has been used and threatens to be used to submit false and fraudulent invoices and line loss information to Z-Tel in an effort defraud Z-Tel out of money and to foreclose and inhibit Z-Tel from participating in the basic local and enhanced services markets.

### B.    Substantive Violations of RICO

126.    SBC, during 2000 and continuing through the filing of this Complaint, has unlawfully, willfully, and knowingly maintained an interest in, or control of, its subsidiaries, Ameritech, Illinois Bell, Michigan Bell, Indiana Bell, and Ohio Bell, directly, or indirectly, through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(b). SBC, through its unlawful and intentional conduct, acted to enhance or protect the value of its subsidiaries,

Ameritech, Illinois Bell, Michigan Bell, Indiana Bell, Ohio Bell, and Wisconsin Bell, (and necessarily, SBC's market power) in a manner directly injurious to Z-Tel.

127.    SBC, during 2000 and continuing through the filing of this Complaint, has unlawfully, willfully, and knowingly conducted and participated, directly and indirectly, in the conduct of its subsidiaries', Ameritech, Illinois Bell, Michigan Bell, Indiana Bell, Ohio Bell, and Wisconsin Bell, affairs through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

128.    Defendants, during 2000 and continuing through the filing of this Complaint, have unlawfully, willfully, and knowingly conducted and participated, directly and indirectly, in the conduct of the enterprises', as alleged directly and in the alternative above, affairs through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

129.    Defendants, in addition or in the alternative, during 2000 and continuing through the filing of this Complaint, unlawfully, willfully, and knowingly did conspire, combine, confederate, and agree together, and with various other persons whose names are both known and unknown, to violate 18 U.S.C. § 1962(b) and 18 U.S.C. § 1962(c), which constitute a violation of 18 U.S.C. § 1962(d).

###    C.    Predicate Acts/Pattern of Racketeering Activity

130.    The enterprises, as alleged directly and in the alternative above, are at all relevant times continuing enterprises, engaging in predicate acts of mail, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343, with the distinct purpose of defrauding Z-Tel out of money and unlawfully foreclosing and inhibiting Z-Tel from participating in the basic local and enhanced services markets.

131.    The predicate acts of mail and wire fraud, alleged herein, continue through the date of this Complaint and are ongoing by virtue of the continued submission of false and

fraudulent invoices and line loss information to Z-Tel in an effort to defraud Z-Tel out of money and foreclose and inhibit Z-Tel from participating in the basic local and enhanced services markets, all to the detriment of Z-Tel and consumers in the SBC Region.

132.    The pattern of racketeering activity, as defined by 18 U.S.C. §§ 1961(1) and (6), presents a distinct threat of continuing unlawful activity.  Defendants continue to engage in mail and wire fraud by submitting false and fraudulent invoices and line loss information to Z-Tel in an effort to defraud Z-Tel out of money and foreclose and inhibit Z-Tel from participating in the enhanced services market.  Such activity, consisting of multiple acts of racketeering (spanning well over 24 months and continuing), is interrelated, not isolated, and is perpetrated for the same or similar purposes by the same persons.  Such activities occurred after the effective date of 18 U.S.C. §§ 1961, *et seq.*, and the last such act occurred within 10 years after the commission of a prior act of racketeering activity.

133.    Defendants, aided and abetted by each other, having devised a scheme or artifice in 2000 to defraud  Z-Tel out of money and impair Z-Tel's ability to compete in the basic local and enhanced services markets, did, for the purpose of furthering and executing such scheme or artifice, defraud, transmit, and cause to be transmitted by means of the mail or wire communications in interstate commerce, writing, signs, signals, pictures, or sound, in violation of 18 U.S.C. § 1341 and § 1343.

**D.     SBC's Subsidiaries Assume A Distinct Role In Facilitating And Masking Defendants' Fraud**

134.    SBC's subsidiaries' role in the racketeering activity complained of here has been and continues to be distinct and separate from that of their parent, SBC Communications, Inc. SBC's subsidiaries undertake distinct roles in facilitating the Defendants' fraudulent scheme:  (1) SBC's subsidiaries have sent Z-Tel invoices by electronic communications and mail on a

monthly basis, beginning in July 2000 to the present, that reflect charges purportedly owed by Z-Tel for the lease of network facilities, which fraudulently and falsely state the amount owed based on misrepresentations of the interconnection information; (2) SBC's subsidiaries sent Z-Tel monthly reports on line loss information, which contain numerous false and fraudulent statements and which were and continue to be untimely, causing Z-Tel to overcharge customers who had changed carriers, but with respect to which Z-Tel had not been informed by SBC; and (3) SBC's subsidiaries have made and continue to make misrepresentations to Z-Tel concerning the accuracy of SBC's invoices and line loss information.  SBC's subsidiaries' actions are all aimed at concealing, masking, and facilitating the Defendants' fraudulent scheme.

135.    SBC also attempted to benefit from the illegal activity of its subsidiaries as alleged herein, and thus is not a passive victim of racketeering activity, but an active perpetrator.

136.    Z-Tel relied on the Defendants' material misstatements, misrepresentations, and falsehoods and has been injured in its business or property by reason of the Defendants' violations of 18 U.S.C. § 1962(b), 1962(c), and 1962(d) and the Defendants' fraudulent conduct.

137.    As a result of the violations of 18 U.S.C. §§ 1962(b), 1962(c), and 1962(d), Z-Tel has suffered substantial damages, and pursuant to 18 U.S.C. § 1964(c), Z-Tel is entitled to recover all actual damages, as well as treble damages.

### SIXTH CAUSE OF ACTION
### LANHAM ACT VIOLATION

138.    Z-Tel incorporates by reference the allegations of paragraphs 1 through 137 of this Complaint, as though fully set forth here.

139.    As described above, SBC, in connection with its provision of basic local and enhanced services, caused to be used in interstate commerce false and misleading descriptions or misleading representations of fact.  These false and misleading descriptions or misleading

representations of fact, in commercial promotion, misrepresented the nature, characteristics, and qualities of Z-Tel's services, in violation of 15 U.S.C. § 1125(a).  In particular, SBC has misrepresented the nature, characteristics, and qualities of both SBC's and Z-Tel's basic local and enhanced services.  For example, by providing line loss information to itself before providing it to Z-Tel and by falsely and fraudulently billing Z-Tel on a regular basis, SBC creates a false impression of the nature, characteristics, and qualities of the customer service Z-Tel provides, which it uses as the basis for its false and misleading descriptions or misleading representations of fact in commercial advertising or promotion.

140.    In addition, SBC has run advertisements on television that refers to competing carriers such as Z-Tel as "parasites" who "give nothing back" and who "invest nothing in the networks."  Other advertisements state that SBC is "a real phone company," implying that competing carriers are not, and calling competing carriers "middlemen."  Further advertisements accuse competing carriers of "go[ing] for short term profits at the expense of what's good for their customers" and making "flashy moves for Wall Street" as compared to SBC "mak[ing] multi-year, multi-billion dollar commitments to develop new technologies for Main Street."  All of these statements constitute false and misleading descriptions or misleading representations of fact in commercial advertising or promotion.

141.    These statements actually deceived or had a tendency to deceive a substantial segment of Z-Tel's potential customers and are likely to influence the customers' purchasing decisions.

142.    As a direct and proximate result of this conduct in violation of the Lanham Act, Z-Tel has suffered actual damages that it is entitled to recover at trial.

## SEVENTH CAUSE OF ACTION
### TORTIOUS INTERFERENCE WITH CONTRACT

143.    Z-Tel incorporates by reference the allegations of paragraphs 1 through 142 of this Complaint, as though fully set forth here.

144.    At all relevant times, SBC was aware that Z-Tel had contracts with a number of subscribers of Z-Tel's services in the SBC Region.

145.    SBC attempted to and did exclude Z-Tel from competing in the SBC Region, in the process interfering with Z-Tel's ability to offer services to consumers there, including causing the cancellation of contracts to purchase Z-Tel service.  SBC further improperly interfered with Z-Tel's existing contracts with customers by, among other things, providing inaccurate billing information, causing Z-Tel to improperly bill its customers with the result, intended by SBC, that Z-Tel's customers canceled their contracts with Z-Tel.

146.    SBC acted with the knowledge and intent that its conduct would prevent Z-Tel from offering competing services, in a deliberate and intentional attempt to restrain trade, injure Z-Tel's business and drive Z-Tel out of business in the SBC Region.

147.    SBC's actions have been and continue to be without legal justification or excuse, and without privilege.

148.    As a direct result of SBC's conduct, SBC has interfered with Z-Tel's ongoing business and contractual relations with customers.  SBC has induced customers to cancel such contracts.  As a direct and proximate result of this conduct, Z-Tel has suffered actual damages that it is entitled to recover at trial.

149.    Moreover, SBC's conduct was willful, malicious, wanton and demonstrated such entire want of care that it raises the presumption of conscious indifference to the consequences it would cause to Z-Tel and consumers in the SBC Region, entitling Z-Tel to punitive damages.

## EIGHTH CAUSE OF ACTION
### INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

150.    Z-Tel incorporates by reference the allegations of paragraphs 1 through 149 of this Complaint, as though fully set forth here.

151.    At all relevant times, SBC was aware of Z-Tel's intention and attempts to offer services in direct competition with SBC, to consumers in the SBC Region.

152.    At all relevant times, SBC was aware the Z-Tel's services would appeal to a number of consumers in the SBC Region.

153.    SBC attempted to and did exclude Z-Tel from competing in the SBC Region, in the process interfering with Z-Tel's ability to offer services to consumers there, including improperly interfering with Z-Tel's prospective business relations with customers by, among other things, wrongfully delaying and refusing to supply facilities necessary for development and completion of Z-Tel's business relations with its prospective customers, and wrongfully delaying and refusing to provide line loss information on a timely basis and on the same terms as SBC provides this information to its retail marketers.

154.    SBC acted with the knowledge and intent that its conduct would prevent Z-Tel from offering competing services, in a deliberate and intentional attempt to restrain trade, injure Z-Tel's business and drive Z-Tel out of business in the SBC Region.

155.    SBC's actions have been and continue to be without legal justification or excuse, and without privilege.

156.    SBC's conduct, as described in the other causes of action herein, was independently tortious and/or unlawful.

157.    As a direct result of SBC's conduct, SBC has induced persons who, but for SBC's interference, were reasonably likely to purchase basic local and enhanced services from Z-Tel

instead to purchase those services from other carriers.  Further, SBC has induced customers not to enter into contracts with Z-Tel.  As a direct and proximate result of this conduct, consumers have been damaged and Z-Tel has suffered actual damages that it is entitled to recover at trial.

158.    Moreover, SBC's conduct was willful, malicious, wanton and demonstrated such entire want of care that it raises the presumption of conscious indifference to the consequences it would cause to Z-Tel and consumers in the SBC Region, entitling Z-Tel to punitive damages.

### NINTH CAUSE OF ACTION
#### UNFAIR COMPETITION

159.    Z-Tel incorporates by reference the allegations of paragraphs 1 through 158 of this Complaint, as though fully set forth here.

160.    SBC's wrongful conduct as described above constitutes unfair competition under the common law and pursuant to the laws of the various states where defendants do business, including but not limited to California Business & Professional Code § 17200, *et seq*.  SBC's unfair business practices hinder rather than promote the efficient operation of the basic local services and enhanced services markets.  The nature of these practices is anticompetitive and injurious to both Z-Tel and consumers of local dial-tone and enhanced services.

161.    In addition, SBC's violation of the antitrust laws, the Telecommunications Act of 1996, the Lanham Act, RICO, and relevant states laws constitutes unfair competition.

162.    As a direct result of this actual and threatened misconduct, competition has been injured, consumers have been damaged, and Z-Tel has suffered and will suffer injury and is entitled to receive all actual damages proximately caused by such conduct, as well as punitive damages.

## TENTH CAUSE OF ACTION
### BUSINESS DEFAMATION AND DISPARAGEMENT

163.    Z-Tel incorporates by reference the allegations of paragraphs 1 through 162 of this Complaint, as though fully set forth here.

164.    SBC's false advertisements have defamed and disparaged the business of Z-Tel. SBC has published, by running advertisements on television, defaming and disparaging statements about Z-Tel that have harmed its financial position and economic interests and have injured the character of its business and its reputation in the industry.

165.    In its advertisements, SBC has falsely called competing carriers such as Z-Tel "parasites" who "give nothing back" and who "invest nothing in the networks."   Other advertisements falsely state that SBC is "a real phone company," implying that competing carriers are not, and calling competing carriers "middlemen."   Other advertisements by SBC falsely accuse competing carriers, like Z-Tel, of "go[ing] for short term profits at the expense of what's best for their customers" and making "flashy moves to dazzle Wall Street" as compared to SBC "mak[ing] multi-year, multi-billion dollar commitments to develop new technologies for Main Street."

166.    In fact, Z-Tel pays SBC a fee for the use of certain essential facilities of SBC's network, pursuant to an FCC-prescribed formula that expressly incorporates a reasonable profit for SBC.  Moreover, Z-Tel is far from a middleman, and instead combines the facilities it leases from SBC with its own equipment, and its own employees, and its own customer service and account management, to provide integrated services in both the basic local and enhanced service markets.  Finally, Z-Tel's actions are not focused on short term profit at the expense of what's best for customers and Z-Tel has, contrary to the advertisement's implication, spent substantial sums developing new technologies and innovative products that SBC does not even provide.

167.    All these facts were known or should have been known to SBC at the time of the publication of SBC's defamatory and disparaging statements.  As a result, SBC's statements were defamatory or were made negligently and without regard to the truth of the statements. SBC's publication of these statements therefore constitutes business defamation.  Z-Tel has suffered and continues to suffer damages as a result of SBC's unlawful conduct, and is entitled to recover nominal, general, and special damages as authorized by law.

168.    In addition or in the alternative, each of these statements is false, not privileged, and malicious.  SBC knew the statements were false or acted in reckless disregard of the fact that the statements were false.  As such, SBC's publication of these statements constitutes business disparagement.  Z-Tel has suffered pecuniary damages as a result of this conduct, including loss of profits and loss of goodwill, entitling Z-Tel to recover actual and punitive damages.

## ELEVENTH CAUSE OF ACTION
### CIVIL CONSPIRACY

169.    Z-Tel incorporates by reference the allegations of paragraphs 1 through 168 of this Complaint, as though fully set forth here.

170.    SBC entered into an agreement or understanding to act in concert with the other defendants as members of a conspiracy, with the purpose and intent of unlawfully depriving Z-Tel of its legal rights, and has taken unlawful acts in furtherance of that conspiracy.

171.    Z-Tel has been injured as a proximate result of the wrongful conduct emanating from this civil conspiracy.  There is no legal justification or excuse for SBC's actions.

## TWELFTH CAUSE OF ACTION
### UNJUST ENRICHMENT

172.    Z-Tel incorporates by reference the allegations of paragraphs 1 through 171 of this Complaint, as though fully set forth here.

173.    SBC has unjustly appropriated for itself the business of Z-Tel's customers and impeded Z-Tel's ability to offer competing basic local and enhanced services.  These actions were wrongful and done without justification, with an intent to harm Z-Tel and enrich SBC.

174.    By accumulating the profits from sales to customers of basic local and enhanced services, SBC has been unjustly enriched by its wrongful conduct.

175.    The unjust enrichment received by SBC  consists of all the profits earned by SBC from the sales of basic local and enhanced services to customers in the SBC Region, which have been earned as a result of SBC's anticompetitive conduct.

176.    Because of SBC's wrongful conduct and unjust enrichment, SBC must disgorge any and all profits, earnings, and other ill-gotten gains attributable to its wrongful actions.

### THIRTEENTH CAUSE OF ACTION
#### EQUITABLE ACCOUNTING

177.    Z-Tel incorporates by reference the allegations of paragraphs 1 through 176 of this Complaint, as though fully set forth here.

178.    SBC has engaged in a concerted scheme to raise Z-Tel's costs by providing inaccurate line loss information and by falsely and fraudulently billing Z-Tel for the use of SBC's network facilities and other items.  On its own, Z-Tel has uncovered many of these errors, but Z-Tel has not been provided with a detailed accounting of the charges that SBC contends it owes, the amount of overcharges by SBC, or individualized charges pertaining to particular network facilities.

179.    As a matter of law, Z-Tel is entitled to a full accounting by SBC of its billing of Z-Tel, including a detailed and itemized accounting of the associated costs with particular network facilities.

## FOURTEENTH CAUSE OF ACTION
### PERMANENT INJUNCTIVE RELIEF

180.    Z-Tel incorporates by reference the allegations of paragraphs 1 through 179 of this Complaint, as though fully set forth here.

181.    Z-Tel has been and will continue to be severely injured by being foreclosed and inhibited from participation in the telecommunications markets in the SBC Region.  Such a broad-based, dramatic foreclosure from markets and competition will continue to cause a loss of reputation, goodwill, and competitiveness, which cannot be adequately compensated for in damages.

182.    Z-Tel prays that this Court grant it a permanent injunction prohibiting SBC from (a) denying access to SBC's essential network facilities on a non-discriminatory basis, including, without limitation, local loops, switching, transport, AIN facilities, and operations support systems; (b) delaying or limiting access to shared transport at discriminatory rates; (c) preventing its DSL customers from purchasing basic local services from a non-SBC carrier; (d) tying its basic local service and its enhanced services; (e) discriminating against Z-Tel in the provision of line loss information in favor of SBC's marketing or retailing affiliates; (f) delaying access to line loss information more than 24 hours; (g) invoicing Z-Tel for leased network facilities that are not specifically listed and cross-referenced against the applicable tariff or interconnection agreement supporting the purported charge; and (h) denying access to and interconnection with SBC's AIN facilities with respect to Z-Tel customers and customers of other local carriers, including SBC.

183.    Z-Tel is entitled to a permanent injunction because it has no adequate remedy at law.

## PRAYER FOR RELIEF

Wherefore, Z-Tel respectfully prays:

1.       That this Court declare under 28 U.S.C. § 2201 that SBC has violated the Sherman Act, RICO, the Lanham Act, and other applicable laws;

2.       That this Court enjoin SBC and each of its officers, directors, agents, employees, successors and assigns, including all defendants, and all persons acting under, through or for SBC, from, in any manner, directly or indirectly, (a) denying access to SBC's essential network facilities on a non-discriminatory basis, including, without limitation, local loops, switching, transport, AIN facilities, and operations support systems; (b) delaying or limiting access to shared transport at discriminatory rates; (c) preventing its DSL customers from purchasing basic local services from a non-SBC carrier; (d) tying its basic local service and its enhanced services; (e) discriminating against Z-Tel in the provision of line loss information in favor of SBC's marketing or retailing affiliates; (f) delaying access to line loss information more than 24 hours; (g) invoicing Z-Tel for leased network facilities that are not specifically listed and cross-referenced against the applicable tariff or interconnection agreement supporting the purported charge; (h) denying interconnection with SBC's AIN facilities; and engaging in an illegal price squeeze;

3.       That this Court award all actual damages incurred by Z-Tel as a result of conduct of SBC;

4.       That this Court order disgorgement of all profits or other ill-gotten gains of SBC;

5.       That this Court award treble damages for violation of the Sherman Act, and RICO;

6.       That this Court award punitive damages for all tortious conduct due to the willful and malicious conduct of SBC; and

7.     That this Court award prejudgment and postjudgment interest and the costs of this action, including reasonable attorneys' fees as allowed for violations of the Sherman Act, RICO, the Lanham Act, and

8.     That this Court order such other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/ *Nicholas H. Patton*
Nicholas H. Patton
SBN: 15631000
PATTON, TIDWELL & SCHROEDER, LLP
4605 Texas Boulevard
P. O. Box 5398
Texarkana, Texas  75505-5398
(903) 792-7080          (903) 792-8233 (fax)
nickpatton@texarkanalaw.com

ATTORNEY IN CHARGE FOR PLAINTIFF
Z-TEL COMMUNICATIONS, INC.

OF COUNSEL:

FULBRIGHT & JAWORSKI L.L.P.
Layne E. Kruse            SBN:  11742550
William R. Pakalka         SBN:  15420800
David J. Van Susteren      SBN:  20495880
Darryl W. Anderson        SBN:  24008694
1301 McKinney, Suite 5100
Houston, Texas  77010-3095
(713) 651-5151          (713) 651-5246 (fax)

Z-TEL COMMUNICATIONS, INC.
Christopher V. Goodpastor    SBN:  00791991
Chief Legal Counsel
601 South Harbour Island Blvd., Suite 220
Tampa, Florida  33602
(813) 273-6261          (813) 233-4623 (fax)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was filed electronically in compliance with Local Rule CV-5(a). As such, this motion was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(a)(3)(A). Pursuant to Fed.R.Civ.P.5(d) and Local Rule CV-5(e), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy via facsimile, U.S. First Class Mail, and/or certified mail, return receipt requested,  this 7th day of  September, 2004.


/s/ *Nicholas H. Patton*
Nicholas H. Patton